UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


```
                            )
In Re: MCMENIMEN, Frederick V., III)   Chapter 7
                            )   Case No. :12-10713 JMD
          Debtors           )
                            )
```

<u>MOTION FOR RELIEF FROM AUTOMATIC STAY</u>

NOW COMES RBS Citizens, N.A. (RBS), with an address of 875 Elm Street, Manchester, New Hampshire, successor by merger to Citizens Bank New Hampshire and moves that the automatic stay in the above matter be lifted to permit it to foreclose on Debtor's property at 6 Pumpkin Circle, Exeter, Rockingham County, New Hampshire, to foreclose upon said real estate.  In support of its Motion, RBS, by and through its attorney, David C. Green, P.C. states as follows:

1.  This proceeding arises in a Chapter 7 case commenced by the debtor under Section 301 of the Bankruptcy Reform Act of 1978 as amended 11 U.S.C. 101 et. seq. (Supp. 1985) ("The Bankruptcy Act");

2.  Jurisdiction of this matter is founded on Section 362 of the Act, and Title 28 of the United States Code, Section 1471, Section 1334, and Section 157;

3.  This Court has entered an order for relief in this case;

4.  RBS is seeking relief from the automatic stay imposed by Section 362 of the Bankruptcy Reform Act, as amended 11 U.S.C. 101 et seq. (Supp. 1987) ("The Bankruptcy Code");

5.   On April 7, 2003, Debtor mortgaged his interest in the premises located at 6 Pumpkin Circle, Exeter, Rockingham County, New Hampshire to RBS ("Mortgage"). The Mortgage was recorded in the Rockingham County Registry of Deeds in Book 4002, Page 1060, and is valid and enforceable; See Exhibit "A" attached hereto.

6.   The Mortgage secured Debtor's obligation arising under that certain Home Equity Line of Credit Agreement dated April 7, 2003 (the "Note") from Debtor in the original amount of Sixty Thousand and 00/100($60,000.00) Dollars;

7.   As a result of having made the loan under the Note, RBS is a holder of a secured claim in the amount set forth below against the Debtor as of the date of July 31, 2012, plus allowable post-petition interest, reasonable attorney's fees, court costs and other recoverable expenses ("Secured Claim"):

a)   $59,713.44

b)   Under the terms of the Note and Mortgage, the Debtor is obligated to make monthly mortgage payments to RBS in the amount of One Hundred Forty Six and 76/100 ($146.76). See Exhibit "B" attached hereto.

c)   On information and belief the amount of RBS's debt secured by the subject premises for the Note and Mortgage is $59,713.44.

2

d)   The value of the property with respect to which relief from the automatic stay is requested is Four Hundred Ninety Eight Thousand Five Hundred ($498,500.00) Dollars.

e)   The face amount of all additional liens attaching the subject premises are:

1.   Mortgage to MERS, in the original principal amount of $385,000, recorded October 26, 2005, in Book 4569, Page 2913 at the Rockingham County Registry of Deeds and assigned to Bank of America, by assignment recorded June 6, 2012 at the Rockingham County Registry of Deeds in Book 5323, Page 215.

2.   United Stated Federal Tax Lien, in the original amount of $341,019.10, recorded February 19, 2008, at the Rockingham County Registry of Deeds in Book 4882, Page 1187.

3.   Attachment by Ronald Passatempa, et al., in the amount of $1,000,000.00, recorded July 13, 2009 in the Rockingham County Registry of Deeds in Book 5032, Page 941.

4.   Attachment by Susan Wagstaff, in the amount of $1,000,000.00, recorded June 11, 2012 in the Rockingham County Registry of Deeds in Book 5279, Page 2297.

<u>FIRST GROUND FOR RELIEF</u>

8.   The Debtor is in default under the terms, conditions and covenants of the Note and Mortgage;

9.   The premises are not necessary to affect reorganization since this is a liquidation case under Chapter 7 of the

Bankruptcy Act;

SECOND GROUND FOR RELIEF

10.  RBS repeats and reiterates each and every allegation made by it in the preceding paragraphs;

11.  The Debtor will not be able to cure the Debtor's subsisting defaults under the terms and conditions of the Note and Mortgage and thereafter comply with and satisfy the terms and conditions of the covenants thereof;

12.  RBS does not have adequate protection, as such term is defined in Section 361 of The Act, for RBS's interest in, and to the property because:

a)  The Debtor cannot provide RBS with adequate protection for RBS's mortgage liens on the premises.

b)  Under the facts of this case, good and sufficient cause within the meaning of Section 362 of The Act exists for granting RBS the relief requested in this motion;

THIRD GROUND FOR RELIEF

13.  RBS repeats and reiterates each and every allegation made by it in the preceding paragraphs;

14.  Defaults have occurred under the terms, conditions and covenants of the Note and Mortgage in particular the April 11, 2012 through August 11, 2012 payments have not been made totaling $717.16.

15.  The continuing defaults by the Debtor under the terms, conditions and covenants of the Note and Mortgage are eroding the

4

value of RBS's interest in and to the premises and have deprived RBS of adequate protection for its interest in and to the premises;

16.  Under the facts of this case, good and sufficient cause within the meaning of Section 362 of The Act exists for granting RBS the relief requested in this motion.

WHEREFORE, RBS respectfully prays that this Bankruptcy Court:

a)  Issue an order relieving RBS from the automatic stay imposed upon RBS by Section 362 of The Act, and granting RBS permission to foreclose its mortgage, interest and lien as permitted under the terms, conditions and covenants of the Note and Mortgage and the laws of the State of New Hampshire;

b)  Grant RBS such further relief as may be just and equitable under the circumstances.

Respectfully submitted,

RBS Citizens, N.A.
By Its Attorney,
David C. Green, P.C.


Dated: 8/6/12                By: /s/David C. Green
                                 DAVID C. GREEN
                                 127 Main Street, Suite 7
                                 PO Box 1068
                                 Nashua, NH  03061-1068
                                 (603) 882-4963
                                 BNH No.: 04020

CERTIFICATION OF SERVICE

    I, David C. Green, attorney for RBS Citizens, N.A.,
hereby certify that on this date I served the foregoing
pleading, causing such pleading to be sent via email to
Michael B. Feinman, Esquire and Mark P. Cornell, Trustee and
by U.S. Certified Mail, to Frederick V. McMenimen, III, PO
Box 412, Exeter, NH 03833.


Dated: 8/6/12                /s/David C. Green
                           David C. Green

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW HAMPSHIRE

In Re: MCMENIMEN, Frederick V., III     No.: 12-10713 JMD
                                        Chapter 7
                                        Hearing Date: 8/28/12 @ 9:00 a.m.

                           Debtor(s)

## CERTIFICATE OF SERVICE

I, _____David C. Green, Esquire_____ of ** _127_

Main Street, Ste. 7, Nashua, NH 03061_____ certify:

That I am, and at all times thereinafter mentioned was, more than 18 years of age; that

on the 6th day of August, 2012 a copy of the notice of hearing and motion were

electronically served on the following parties:

Michael B. Feinman, Esquire and Mark P. Cornell, Trustee

The parties not served electronically were served by certified mail, pursuant to Local

Bankruptcy Rule 4001-1(d), upon the debtor (s) ___Frederick V. McMenimen, III, PO

Box 412, Exeter, NH 03833_____the debtor(s) attorney _____

at ** _____     and the Trustee _____ at **

_____.

I certify under penalty of perjury that the foregoing in true and correct.

Executed on: 8/6/12___             /s/David C. Green___
                                   Signature

** State mailing address(es)

kam/8 03/orderbk/forms16

Case: 12-10713-JMD Doc #: 50-2 Filed: 08/06/12 Desc: Exhibit Page 1 of 20

BK4002PG1060



**CITIZENS BANK**

——————————————— (Space Above This Line For Recording Data) ———————————————

OPEN-END MORTGAGE
Home Equity Credit Line

THIS MORTGAGE (the "Security Instrument") is DATED  04/07/2003
The mortgagor(s) is/are

FREDERICK V MCMENIMEN III

AND

SHAUNA S MCMENIMEN

HUSBAND AND WIFE

This Instrument filed for record by AL
as an accommodation only. It has not
been examined as to its execution or
as to its affect upon title.

2003 APR 15  PM 3:04

042273

ROCKINGHAM COUNTY
REGISTRY OF DEEDS

NHO  REV. 01/03                  Page 1 of 12

Exhibit "A"

Case: 12-10713-JMD Doc #: 50-2 Filed: 08/06/12 Desc: Exhibit Page 2 of 26

BK4002PG1061

(the "Mortgagor"). This Security Instrument is granted to the Mortgagee
**Citizens Bank New Hampshire**

a savings bank organized under the laws of the state where the Lender has its principal place of business,
**875 Elm Street, Manchester, NH 03101**
("Lender").

This Security Instrument secures to the Lender (i) the repayment of the debt evidenced by a Home Equity
Credit Line Agreement made in favor of the Lender by

**FREDERICK V MCMENIMEN III**

**SHAUNA S MCMENIMEN**

and dated as of __04/07/2003__ (the "Agreement"), including, but not limited to, any
future advances, with interest thereon, made to the maker(s) of the Agreement by the Lender under
**Paragraph 1** below, (ii) all renewals, extensions and modifications of the Agreement, (iii) the payment of
all other sums, with interest, advanced under **Paragraph 9** below to protect the security of this Security
Instrument, and (iv) the performance of the covenants and agreements under this Security Instrument and
the Agreement.

The Agreement is an adjustable rate consumer revolving loan agreement, pursuant to which the Lender
has agreed to lend money to the Mortgagor from time to time pursuant to an open-end credit plan.

The maximum amount secured by this Security Instrument is $ __50,000.00__
of principal, plus interest thereon and all other charges and fees imposed by the Lender under the
Agreement and this Security Instrument, including, but not limited to, amounts disbursed by the Lender
under **Paragraph 9** below.

BK 4002 PG 1062

For this purpose, the Mortgagor, in consideration of the debt evidenced by the Agreement, does hereby mortgage, grant and convey to the Lender and the Lender's successors and assigns, with STATUTORY POWER OF SALE AND MORTGAGE COVENANTS, the following described property located in the County of          ROCKINGHAM

State of New Hampshire:

"See attached legal description hereto and made a part hereof."

which has the address of  6  PUMPKIN CIRCLE,  EXETER,  NH  03833

New Hampshire                        (the "Property Address");

This mortgage is upon the statutory conditions and other conditions and covenants set forth in this mortgage, for any breach of which the Lender shall have the STATUTORY POWER OF SALE.

TOGETHER with all the improvements now or hereafter erected on the property described above, and all easements, rights, appurtenances, fixtures and rents now or hereafter a part of or related to the property described above, all of which shall be deemed to be and remain a part of such property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing shall be referred to in this Security Instrument as the "Property."

THE MORTGAGOR COVENANTS that the Mortgagor is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property, and that the Property is unencumbered, except for encumbrances expressly permitted by this Security Instrument. The Mortgagor warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances expressly permitted by this Security Instrument.

The Mortgagor and the Lender covenant and agree as follows:

1.  **Open-End Mortgage.**  This Security Instrument is an open-end mortgage and the Lender shall have all the rights, powers and protections to which the holder of any open-end mortgage is entitled, including, without limitation, all rights, powers and protections under Section 28B of Chapter 183 of the New Hampshire General Laws. The makers of the Agreement may borrow, repay and re-borrow such amounts as desired, subject to the terms and conditions of the Agreement. The amounts which the Mortgagor borrows and re-borrows under the Agreement shall be referred to in this Security Instrument as "Future Advances."

The Mortgagor agrees that each Future Advance shall be secured by and have priority under this Security Instrument as if such Future Advance were made as of the date this Security Instrument was recorded.

At no time shall the principal amount of the debt secured by this Security Instrument exceed the maximum principal amount of the Agreement, nor shall the maturity of Future Advances secured by this Security Instrument extend beyond the maturity date of the Agreement. All Future Advances shall be recorded on the books and records of the Lender.

BK4002PG1063

**2. Future Advances Benefit Mortgagor Even if Mortgagor is Not Also a Maker of the Agreement.** If a Mortgagor is not also a maker of the Agreement, such Mortgagor further agrees that (i) each Future Advance shall be considered as an advance for the benefit of such Mortgagor, and (ii) such Mortgagor shall be liable for the debt evidenced thereby, as if such Mortgagor had signed the Agreement; *provided, however,* that the extent of such Mortgagors liability for such debt shall be limited to such Mortgagor's interest in the Property, including, but not limited to, any rents, policies of hazard insurance maintained on the Property and proceeds thereof, and any award of damages on account of any condemnation for public use of or injury to the Property. With respect to such Mortgagor only, the Lender agrees to look solely to the Property and such rents, policies, proceeds and condemnation awards in satisfaction of the debt secured hereby.

The Lender and any other Mortgagor or maker(s) of the Agreement may agree to extend, modify, forbear or make any other accommodations with regard to the terms of this Security Instrument or the Agreement without such Mortgagor's consent and without releasing such Mortgagor or modifying this Security Instrument as to such Mortgagor's interest in the Property.

**3. Payment of Principal and Interest.** The Mortgagor shall promptly pay when due the principal of and the interest on the debt evidenced by the Agreement, and all other fees and charges as provided in the Agreement, and the principal of and interest on any Future Advances secured by this Security Instrument. This Security Instrument secures payment of the Agreement according to its terms, which are incorporated by reference into this Security Instrument.

**4. Application of Payments.** Unless applicable law requires otherwise, all payments received by the Lender under this Security Instrument and the Agreement may be applied to reduce amounts owing to the Lender from the Mortgagor and from the maker(s) of the Agreement in whatever order the Lender, in its sole discretion, chooses.

**5. Variable Rate.** The Agreement provides for changes in the rate of finance charge, as more particularly described in the Agreement. All references to interest in this Security Instrument shall be to the variable rate of finance charge set forth in the Agreement.

**6. Prior Mortgages and Deeds of Trust; Charges; Liens.** The following provisions concerning existing indebtedness ("the Senior Mortgage") are a part of this Mortgage. The lien of this Mortgage securing the indebtedness may be secondary and inferior to an existing lien. Grantor expressly covenants and agrees to pay, or see to the payment of, the Senior Mortgage and to prevent any default on such Senior Mortgage, any default under the instruments evidencing such indebtedness, or any default under any security documents for such indebtedness.

The Mortgagor represents and warrants that the Senior Mortgage is not in default and that no breach of condition thereof exists. The Mortgagor shall not modify, amend or extend the Senior Mortgage or the debt secured thereby without the written consent of the Lender. The Mortgagor shall pay or cause to be paid all taxes, assessments, and other charges, fines, and impositions attributable to the Property which may attain a priority over this Security Instrument, and leasehold payments or ground rents, if any.

The Mortgagor shall not allow any lien or encumbrance to attach to the Property, other than the lien for unpaid real estate taxes not yet due and payable (the "Accrued Taxes") and the Senior Mortgage. Without limiting the scope of the foregoing, the Mortgagor shall promptly discharge any lien, other than the Accrued Taxes and Senior Mortgage, which has priority over this Security Instrument unless the Mortgagor (i) in good faith contests the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion, operate to prevent the enforcement of the lien or forfeiture of any part of the Property, and (ii) deposits with the Lender money or other security acceptable to the

BK4002PG1064

Lender to satisfy the amount of such lien. If the Lender determines that any part of the Property is subject to a lien prohibited under this Security Instrument, the Lender may give the Mortgagor a notice identifying the lien, and the Mortgagor shall satisfy the lien or take one or more of the actions described above within ten (10) days of the giving of notice.

**7. Hazard or Property Insurance.** The Mortgagor shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage", and such other hazards as the Lender may require, including without limitation, flood insurance. This insurance shall be maintained in such amounts and for such periods as the Lender may require. Without limiting the foregoing, this insurance shall be maintained in an amount no less than the maximum principal amount of the Agreement plus all amounts secured by mortgages which have priority over this Security Instrument, unless the replacement value of the Property is less than this sum, in which case this insurance shall be for the full replacement value of the buildings on the real property secured by the mortgage.

Where appropriate, the Lender may require the Mortgagor to maintain insurance against rent loss in addition to the insurance described above.

The insurance carrier providing the insurance shall be chosen by the Mortgagor subject to the Lender's approval which shall not be unreasonably withheld. All insurance policies and renewals shall be in form and content acceptable to the Lender, with such maximum deductible clauses as the Lender may require, and shall include a standard mortgage clause in favor of and in a form acceptable to the Lender. The Lender shall have the right to hold the policies and renewals, subject to the terms of the Senior Mortgage.

All insurance policies and renewals shall provide that they may not be cancelled without ten (10) days' prior written notice to the Lender. If the Lender requires, the Mortgagor shall promptly give to the Lender all receipts of paid premiums and renewal notices. In the event of loss, the Mortgagor shall give prompt notice to the insurance carrier and the Lender. The Lender may make proof of loss if not made promptly by the Mortgagor.

Unless the Lender and the Mortgagor otherwise agree in writing, or unless otherwise required under the terms of the Senior Mortgage, casualty insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and the Lender's security is not lessened. If the restoration or repair is not economically feasible or the Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to the Mortgagor.

If the Mortgagor abandons the Property, or does not answer within thirty (30) days a notice from the Lender that the insurance carrier has offered to settle a claim of insurance benefits, then the Lender may collect and apply the insurance proceeds. The Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The thirty (30) day period will begin when the Lender sends the notice to the Mortgagor.

Unless the Lender and the Mortgagor otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in *Paragraph 3* above or change the amount of the payments. If, under *Paragraph 19* below, the Property is acquired by the Lender, the Mortgagor's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to the Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

Page 5 of 12

BK4002PG1065

**8. Preservation, Maintenance and Protection of Property; Mortgagor's Loan Application; Leaseholds.** The Mortgagor shall keep the Property in good repair and shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property. The Mortgagor shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or the Lender's security interest.

The Mortgagor shall also be in default if the Mortgagor, during the loan application process, gave materially false or inaccurate information or statements to the Lender (or failed to provide the Lender with any material information) in connection with the loan evidenced by the Agreement.

The Mortgagor shall comply with all provisions of any lease if this Security Instrument is on a leasehold. If the Mortgagor acquires fee title to the Property, the leasehold and the fee title shall not merge unless the Lender agrees to the merger in writing.

**9. Protection of Lender's Rights in the Property; Mortgage Insurance.** If the Mortgagor fails to perform the covenants and agreements contained in this Security Instrument promptly, or if there is a legal or administrative proceeding that, in the judgment of the Lender, may significantly affect the Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or to enforce laws or regulations), then the Lender may do or pay for whatever the Lender determines is necessary to protect the value of the Property and the Lender's rights in the Property. The Lender's actions may include paying reasonable attorneys' fees and entering (or causing its agent or independent contractor to enter) on the Property to make repairs. Although the Lender may take action under this *Paragraph 9*, the Lender does not have to do so.

Any amounts disbursed by the Lender under this *Paragraph 9* shall become additional debt of the Mortgagor secured by this Security Instrument. Unless the Mortgagor and the Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the variable rate of interest applicable to the Agreement, and shall be payable, with interest, upon notice from the Lender to the Mortgagor requesting payment.

If the Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, the Mortgagor shall pay the premiums required to maintain the mortgage insurance in effect until such time as the requirement for the mortgage insurance terminates in accordance with the Mortgagor's and the Lender's written agreement or applicable law.

**10. Inspection.** The Lender or its agent or independent contractor may make reasonable entries upon and inspections of the Property. The Lender shall give the Mortgagor notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

**11. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of part or all of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to the Lender subject to the terms of the Senior Mortgage and any other mortgage, deed of trust or other security agreement with a lien which has priority over this Security Instrument.

In the event of a total taking of the Property, subject to the terms of the Senior Mortgage, the proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid the Mortgagor. In the event of partial taking of the Property, unless the Mortgagor and the Lender agree in writing or otherwise required under the terms of Senior Mortgage, the proceeds shall at the option of the Lender be applied toward the amounts secured hereby in such order as the Lender may determine or toward the repair, rebuilding or restoration of the Property upon such conditions as the Lender may require, or toward both of such purposes.

BK4002PG1066

If the Property is abandoned by the Mortgagor, or if, after notice by the Lender to the Mortgagor that the condemnor offers to make an award or settle a claim for damages, the Mortgagor fails to respond to the Lender within thirty (30) days after the date the notice is given, the Lender is authorized subject to the terms of the Senior Mortgage, to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

Unless the Lender and the Mortgagor otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in *Paragraph 3* above or change the amount of such payments.

**12. Mortgagor Not Released; Forbearance by Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by the Lender to any maker(s) of the Agreement or to any successors in interest of the Mortgagor or of any such maker shall not operate to release the liability of the original Mortgagor or Mortgagor's successors in interest. The Lender shall not be required to (i) begin proceedings against any maker(s) of the Agreement or successors in interest of the Mortgagor or of any maker(s) of the Agreement, (ii) refuse to extend time for payment, or (iii) otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original maker(s) of the Agreement or the Mortgagor or any successor in interest of the Mortgagor or such maker. The Lender's forbearance in exercising any right or remedy shall not be a waiver of or preclude the exercise of any such right or remedy.

**13. Successors and Assigns Bound; Joint and Several Liability.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of the Lender and the Mortgagor, subject to the provisions of *Paragraph 17* below. The Mortgagor's covenants and agreements shall be joint and several.

**14. Notices.** Any notice to the Mortgagor provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address which the Mortgagor designates by written notice to the Lender. Any notice to the Lender shall be given by first class mail to the Lender's address stated herein or to any other address which the Lender designates by notice to the Mortgagor. Any notice provided for in this Security Instrument shall be deemed to have been given to the Mortgagor or the Lender when delivered, or two (2) business days following mailing as provided in this *Paragraph 14.*

**15. Governing Law; Severability.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Agreement conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Agreement which can be given effect without the conflicting provision. To this end, the provisions of this Security Instrument and the Agreement are declared to be severable.

**16. Borrower's Copy.** The Borrower shall be given a copy of the Agreement and of this Security Instrument.

BK4002PG1067

**17. Transfer of the Property or a Beneficial Interest in the Mortgagor, Assumption.** If the Mortgagor sells or transfers all or any part of the Property or any interest in the Property (or if a beneficial interest in the Mortgagor is sold or transferred and the Mortgagor is not a natural person) without the Lender's prior written consent, the Lender will terminate the Lender's commitment to make Future Advances, and will require immediate repayment in full of all sums secured by this Security Instrument, unless prohibited by applicable law. This Security Instrument may not be assumed.

**18. Optional Reinstatement of Security Instrument by Lender.** Notwithstanding the Lender's acceleration of the sums secured by this Security Instrument, the Lender may, in its sole discretion, discontinue any proceedings begun by the Lender to enforce this Security Instrument at any time prior to foreclosure under the STATUTORY POWER OF SALE or entry of a judgment enforcing this Security Instrument if: (i) the Mortgagor pays the Lender all sums which would be then due under this Security Instrument and the Agreement, had no acceleration occurred, (ii) the Mortgagor cures all breaches of any other covenants or agreements of the Mortgagor contained in this Security Instrument and in the Agreement, (iii) the Mortgagor pays all reasonable expenses incurred by the Lender in enforcing the covenants and agreements of the Mortgagor contained in this Security Instrument and in enforcing the Lender's remedies as provided in *Paragraph 19* below, including, but not limited to, reasonable attorneys' fees, (iv) the Mortgagor, at the sole option of the Lender, executes a Mortgage Agreement and Deed Modification Agreement which will adjust the rate of interest on the Agreement and will provide such other terms and conditions as the Lender shall specify, including, but not limited to, a termination of the rights of the Maker(s) of the Agreement to Future Advances, and (v) the Mortgagor takes such actions as the Lender may require to assure that the lien of this Security Instrument, the Lender's interest in the Property and the Mortgagor's obligation to pay the sums secured by this Security Instrument shall continue unimpaired. In the event that the Lender allows the Mortgagor to make such payments and cure this Security Instrument, this Security Instrument as modified and the obligations secured hereby shall remain in full force and effect as if no acceleration had occurred. Nothing in this *Paragraph 18* shall be deemed to require the Lender to allow the Mortgagor to cure this Security Instrument or otherwise discontinue any proceedings begun by the Lender to enforce this Security Instrument.

**19. Acceleration; Remedies.** To the full extent permitted by law, upon a breach by the Mortgagor of any covenant in or condition of this Security Instrument or the Agreement or of any instrument executed in connection with this Security Instrument or the Agreement, or upon a breach by the Mortgagor of the Statutory Condition, the Lender may (i) require immediate payment in full of all sums secured by this Security Instrument without demand or notice, except as expressly prohibited by applicable law, and/or (ii) invoke the STATUTORY POWER OF SALE and any other remedies permitted by applicable law. The Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this *Paragraph 19*, including, but not limited to, reasonable attorneys' fees, costs of title evidence, abstracts and title reports.

If the Lender invokes the STATUTORY POWER OF SALE, the Lender shall mail a copy of a notice of sale to the Mortgagor, and to other persons prescribed by applicable law, in the manner provided by applicable law. The Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by applicable law. The Lender or its designees may purchase the Property at any sale and/or sell the Property in one or more parcels, as the Lender, in its sole discretion, deems appropriate. Subject to the rights of any senior lienholders to proceeds of any foreclosure sale, the proceeds of the sale shall be applied in the following order: (i) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees, (ii) to all sums secured by this Security Instrument; and (iii) any excess to the person or persons legally entitled to it.

BK4002PG1068

**20. Assignment of Rents.** The Mortgagor unconditionally assigns and transfers to the Lender all the rents and revenues of the Property. The Mortgagor authorizes the Lender or the Lender's agents and/or independent contractors to collect the rents and revenues and hereby directs each tenant of the Property to pay the rents to the Lender or the Lender's agents and/or independent contractors. However, prior to the Lender's notice to the Mortgagor of the Mortgagor's breach of any covenant or agreement in this Security Instrument, the Mortgagor shall collect and receive all rents and revenues of the Property as trustee for the benefit of the Lender and the Mortgagor. This assignment of rents constitutes an absolute assignment and not an assignment for additional security only.

If the Lender gives notice of breach to the Mortgagor: (i) all rents received by the Mortgagor shall be held by the Mortgagor as trustee for the benefit of the Lender only, to be applied to the sums secured by the Security Instrument; (ii) the Lender shall be entitled to collect and receive all of the rents of the Property; and (iii) each tenant of the Property shall pay all rents due and unpaid to the Lender's agent on the Lender's written demand to the tenant.

The Mortgagor has not executed any prior assignment of the rents, except in favor of the holder of the Senior Mortgage, and has not and will not perform any act that would prevent the Lender from exercising its rights under this *Paragraph 20*.

The Lender shall not be required to enter upon, take control of or maintain the Property before or after giving notice of breach to the Mortgagor. However, the Lender or a judicially appointed receiver may do so at any time there is a breach. Any application of rents shall not cure or waive any default or invalidate any other right or remedy of the Lender. This assignment of rents of the Property shall terminate when the debt secured by this Security Instrument is paid in full.

**21. Hazardous Substances.** The Mortgagor shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. The Mortgagor shall not do, or allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the lawful presence, use or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

The Mortgagor shall give the Lender prompt written notice of any investigation, claim, demand, lawsuit or other action by any governmental regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which the Mortgagor has actual knowledge. If the Mortgagor learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, the Mortgagor shall promptly take all necessary actions in accordance with applicable environmental law.

As used in this Paragraph 21, "Hazardous Substances" are those substances defined as toxic or hazardous substances by environmental law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this Paragraph 21, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

Case: 12-10713-JMD Doc #: 30-2 Filed: 06/06/12 Desc: Exhibit B Page 19 of 20

BK4002PG1069

**22. Loan Charges.** If the Agreement is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Agreement exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from Mortgagor which exceeded permitted limits will be refunded to Mortgagor. The Lender may choose to make this refund by reducing the principal owed under the Agreement or by mailing a direct payment to Mortgagor. If a refund reduces principal, the reduction will be treated as a partial prepayment under the Agreement.

**23. Legislation.** If enactment or expiration of applicable laws has the effect of rendering any provision of the Agreement or this Security Instrument unenforceable according to its terms, the Lender, at its option, may (i) terminate its commitment to make Future Advances, (ii) require immediate payment in full of all sums secured by this Security Instrument, and/or (iii) invoke any remedies permitted by *Paragraph 19* unless expressly prohibited by applicable law.

**24. Release.** Upon termination and discharge of the Agreement and all other sums secured by this Security Instrument, this Security Instrument shall become null and void and the Lender shall release this Security Instrument without charge to the Mortgagor. The Mortgagor shall pay any recordation costs.

**25. Waivers.** The Mortgagor waives all rights of homestead exemption in the Property and all rights of curtesy and dower in the Property.

**26. Condominium and Planned Unit Development Provisions.** In the event the Property is a unit or units of a condominium or planned unit development, the Mortgagor hereby covenants and agrees to the following as additional conditions of this Security Instrument:

(a) The Mortgagor shall promptly pay the Mortgagor's share of common expenses and all assessments as required by the Constituent Documents as the same become due and payable, and shall fully and faithfully keep and perform each and every covenant, agreement, and provision in such Constituent Documents. As used herein, the term "Constituent Documents" shall mean the master deed or declaration establishing the condominium or planned unit development, the documents establishing the governing body of such condominium or planned unit development (the "Association"), or any by-laws, rules, regulations, or resolutions adopted pursuant to either thereof.

(b) If there is in force a master insurance policy insuring the Property against loss from fire and other hazards customarily included in extended coverage insurance in an amount sufficient to provide the full replacement cost coverage of the Property (exclusive of land) in such amounts and for such periods as the Lender may require, such insurance (together with such casualty insurance on the contents of the units as the Lender may require) shall satisfy the Mortgagor's obligations to the Lender under *Paragraph 7* above relating to hazard or property insurance, unless the Lender requires the Mortgagor to maintain additional insurance. The Lender shall be entitled to require the Mortgagor to maintain such additional insurance if the Lender determines that the Mortgagor's percentage interest in the proceeds of such a master policy inadequately protects the Lender's interest or if for any other reason the Lender deems such additional insurance appropriate. In the event of a casualty loss to or taking of the condominium or planned unit development or to any of the units therein:

(i) The Mortgagor shall immediately notify the Lender of such loss or taking.

Page 10 of 12

BK4002PG1070

(ii)    The Lender may elect to vote under the terms of and as provided in the Constituent Documents in place and stead of the Mortgagor with respect to all matters of repair and restoration of the same, and with respect to the disposition of the insurance proceeds or condemnation proceeds, and the Mortgagor hereby irrevocably appoints the Lender as the Mortgagor's attorney-in-fact so to vote, which appointment as attorney in fact is coupled with the Lender's interest in the Property.

(iii)    The Mortgagor will make all advances as required by the Association for repair and restoration due to inadequacy of insurance proceeds or taking proceeds, provided that it has been voted to proceed with such repair and restoration.

(iv)    The Mortgagor assigns to the Lender its right to receive any insurance proceeds or other funds payable as a result of damage or condemnation and not applied to a restoration and agrees to pay to the Lender any such funds received by the Lender which are received by the Mortgagor.

(v)    The Mortgagor shall take such actions as may be reasonably necessary to insure that the Association maintains public liability insurance in amounts and such forms as are acceptable to the Lender.

(c)    The Mortgagor shall promptly deliver to the Lender a true and full copy of each and every notice of default received by the Mortgagor with respect to any obligation of the Mortgagor under the Constituent Documents.

(d)    The Mortgagor shall not vote for or consent to any modification of, or amendment to, or relaxation in the enforcement of any provision of the Constituent Documents, without the prior written consent of the Lender. The Mortgagor shall not vote to petition or subdivide the condominium or planned unit development or vote to (i) abandon or terminate the condominium or planned unit development, (ii) terminate professional management of the condominium or the planned unit development, or (iii) take action which would render the insurance coverages maintained by the Association unacceptable to the Lender without, in each case, the prior written consent of the Lender.

BK4002PG1071

### REQUEST FOR NOTICE OF DEFAULT AND FORECLOSURE
### UNDER SUPERIOR MORTGAGES OR DEEDS OF TRUST

The Mortgagor and the Lender request the holder of any mortgage, deed of trust or other encumbrance with a lien which has priority over this Security Instrument to give notice to the Lender, at the Lender's address stated herein, of any default under the superior encumbrance and of any sale or other foreclosure action.

BY SIGNING BELOW, the Mortgagor accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by the Mortgagor and recorded with it.

_____
FREDERICK V MCMENIMEN III

_____
SHAUNA S MCMENIMEN

Case: 12-10713-JMD  Doc #: 50-2  Filed: 08/06/12  Desc: Exhibit  Page 19 of 20

BK4002PG1072

## INDIVIDUAL ACKNOWLEDGMENT

STATE OR COMMONWEALTH OF ___NH___ )

COUNTY OF ___Rockingham___ )  )SS:

On the ___7___ day of ___April___, ___2003___, before me appeared

## FREDERICK V MCMENIMEN III

to me personally known to be the person(s) whose name(s) is/are subscribed to this instrument, and such person(s) acknowledged that he/she/they (i) executed the same for the purposes therein contained, and (ii) executed this instrument as their free act and deed.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

(Official Seal)

_Linda Marie Eaton_
Notary Public

LINDA MARIE EATON, Notary Public
My Commission Expires May 12, 2004

Attention Registry of Deeds/Town or City Clerk:

Mail to: Citizens Bank Consumer Finance Operations
480 Jefferson Boulevard
Warwick, RI 02886

Acknbt 01/03

BK4002PGI073

## INDIVIDUAL ACKNOWLEDGMENT

STATE OR COMMONWEALTH OF __NH__ )

COUNTY OF __Rockingham__ )SS:

On the __7__ day of __April__, __2003__, before me appeared

## SHAUNA S MCMENIMEN

to me personally known to be the person(s) whose name(s) is/are subscribed to this instrument, and such person(s) acknowledged that he/she/they (i) executed the same for the purposes therein contained, and (ii) executed this instrument as their free act and deed.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

(Official Seal)

_____
Notary Public
LINDA MARIE EATON, Notary Public
My Commission Expires May 12, 2004

Attention Registry of Deeds/Town or City Clerk:

Mail to: Citizens Bank Consumer Finance Operations
         480 Jefferson Boulevard
         Warwick, RI 02886

AckNH  01/03



**ADI REPORTING SERVICES**
A division of Asset Discovery, Inc.  Tel: (800) 470-5522  Fax: (888) 470-5522
463 Worcester Road, Suite 305
Framingham, MA 01701

BK4002PG1074

### SCHEDULE A

6 Pumpkin Circle
Exeter NH 03833
Frederick V. McMenimen, III & Shauna S. McMenimen

The land with the buildings thereon situated in Exeter, Rockingham County, State of New Hampshire
known and being numbered: 6 Pumpkin Circle

The premises are conveyed subject to and with the benefit of all rights, rights of way, easements,
appurtenances, reservations, restrictions, and layouts and takings of record, insofar as they are in force and
applicable.

Meaning and intending to mortgage the same premises by deed of J. Arthur Tufts, Jr. to Frederick V.
McMenimen, III and Shauna S. McMenimen, dated 02/11/1994 and filed with the Rockingham County
Registry of Deeds, Record Book 3037, Page 985; wherein a more detailed description of the premises is set
forth.

Filed with:

**ROCKINGHAM COUNTY REGISTRY OF DEEDS**
#10 Rte 125 Brentwood NH
Tel: (603) 642-5526

Discrepancy Codes:
07

Cust Ref #:    2569
ADI Ref #:    19034-035026

When recorded, please return to:

**Citizens Bank**

Document Control Office
Citizens Bank Document Control
One Citizens Drive
Riverside, RI 02915

Page 1

Report Ordered:    03/19/2003
Report Furnished:   03/21/2003

(Transmitted page 1 of 1)

Printed On: 8:10:56AM, 4/11/2008



**CITIZENS BANK**

## SECONDARY MORTGAGE LOAN

### HOME EQUITY LINE OF CREDIT AGREEMENT

Borrower(s):

        FREDERICK V MCMENIMEN III

        SHAUNA S MCMENIMEN

Lender:
☐ Citizens Bank of Massachusetts
28 State Street
Boston, MA 02109

☐ Citizens Bank of Connecticut
63 Eugene O'Neill Drive
New London, CT 06320

☐ Citizens Bank of Pennsylvania
1735 Market Street
Philadelphia, PA 19103

☐ Citizens Bank of Rhode Island
1 Citizens Plaza
Providence, RI 02903

☒ Citizens Bank New Hampshire
875 Elm Street
Manchester, NH 03101

☐ Citizens Bank
919 North Market Street
Suite 200
Wilmington, DE 19801

---

Date of Agreement: **04/07/2003**

This HOME EQUITY LINE OF CREDIT AGREEMENT ("Agreement") contains the terms which govern your line of credit (the "Credit Line" or the "Credit Line Account") issued through Citizens Bank of Massachusetts, Citizens Bank of Rhode Island, Citizens Bank of Connecticut, Citizens Bank New Hampshire, Citizens Bank of Pennsylvania, or Citizens Bank (our Delaware Bank) as identified above and hereafter referred to as "Citizens Bank". The Agreement sets forth the terms under which Citizens Bank extends credit advances against your Credit Line Account. Each person who signs this Agreement will be bound by its terms and conditions and will be responsible for paying all amounts owed. In this Agreement, the words "Borrower," "you," "your," and "Applicant" mean each and every person who signs this Agreement, including all Borrowers named above. The words "we," "us," "our," and "Lender" mean Citizens Bank as identified above. **You agree to the following terms and conditions:**

**1. Promise to Pay.** You promise to pay Citizens Bank the total of all credit advances made by us under the terms of this Agreement, any other charges, and **FINANCE CHARGES** due, together with all costs and expenses for which you are responsible under this Agreement or under the "Mortgage" which secures this Agreement. You will pay your Credit Line according to the payment terms set forth below.

**2. Term.** The term of your Credit Line will begin as of the date of the Agreement ("Opening Date") and will continue until termination of your Credit Line Account. All indebtedness under this Agreement, if not already paid pursuant to the payment provisions below, will be due and payable upon termination. The "Draw Period" of your Credit Agreement will begin on a date, after the Opening Date, when the Agreement is accepted by us in the Commonwealth or State in which you signed the Agreement: Commonwealth of Massachusetts, State of Rhode Island, State of Connecticut, State of New Hampshire, Commonwealth of Pennsylvania or State of Delaware, following the expiration of the right to cancel, the perfection of the Mortgage, and the meeting of all of our other conditions and will continue for a period of Ten (10) Years, subject to the terms and conditions of this Agreement. You may obtain credit advances during the "Draw Period" not to exceed, at any time, the credit limit of your line of credit, which is $ **60,000.00** and more fully described in **paragraph 5**, "Credit Limit". After the Draw Period ends, the Repayment Period will begin; and you will no longer be able to obtain credit advances. The length of the Repayment Period is Fifteen (15) Years. The end of the Fifteen (15) Years is known as the "Maturity Date". You agree that, at our discretion, we may renew or extend the period during which you may obtain credit advances or make payments.

**3. Payments.**

    a) **Draw Period**
    You can obtain advances of credit for Ten (10) years (the "Draw Period"). You have chosen the payment option checked below. The option checked below is based on the option that was indicated on your home equity application. If no option was indicated on your application, the loan will default to Option One (Interest Only).

☒ **Option One:** Monthly interest-only payments - Under this option, your payments will be due monthly and will equal the finance charges that accrued on the outstanding principal balance during the preceding billing period, plus insurance premiums (if any), all other charges and any amount past due. The Minimum Payment will not reduce the principal that is outstanding on your Credit Line Account. This option will result in greater expenses over the life of the Credit Line Account.

☐ **Option Two:** 2% of the balance - Under this option, your payments will be due monthly and will equal 2% of the New Total Balance (which includes the principal balance and outstanding finance charges as of the end of the billing period plus insurance premiums [if any], and

gel Rev 11/02

*Exhibit "B"*

Case: 12-10713-JMD Doc #: 219 Filed: 04/12/17 Desc: Main Document Page 24 of 37
Case: 12-10713-JMD Doc #: 50-2 Filed: 06/00/12 Desc: Exhibit Page 19 of 20

Page 2

all other charges), plus late fees and any amount past due. The Minimum Payment will equal $20.00 or the outstanding balance on your Credit Line Account, whichever is less.

**b) Changing Your Draw Period Payment Option**

You may change your Draw Period Payment Option from Option 1 to Option 2, or from Option 2 to Option 1. You must ask us in writing at least 15 days before the start of the billing cycle in which you want to change your Draw Period Payment Option.

We do not have to let you change your Draw Period Payment Option if; (i) any of your payments under this agreement are past due at the time you make your request, (ii) your account balance is higher than your credit line at the time when you ask us to change your Draw Period Payment Option, or (iii) we, in our sole discretion, believe that your account is not in good standing.

**c) Repayment Period**

After the Draw Period ends, you will no longer be able to obtain credit advances and must repay the outstanding balance over 15 years (the "Repayment Period"). During the Repayment Period, your regular payment will be based on an amortization of your balance over a 180 month period or $20.00, whichever is greater. Your payments will be due monthly. In calculating the payment amount by amortizing the balance over a 180 month period, we will use the applicable variable Annual Percentage Rate in effect on the day we calculate your payment. Your "Minimum Payment" will be the regular payment, plus any amount past due and all other charges. In any event, if your Credit Line Account balance falls below $20.00, you agree to pay your balance in full.

A change in the **ANNUAL PERCENTAGE RATE** can cause the balance to be repaid more quickly or more slowly. When rates decrease, less interest is due, so more of the payment repays the principal balance. When rates increase, more interest is due, so less of the payment repays the principal balance. If this happens, we may adjust your Minimum Payment as follows: Each time the **ANNUAL PERCENTAGE RATE** increases we will review the effect the increase has on your Credit Line Account. If the **ANNUAL PERCENTAGE RATE** has increased so much that your Minimum Payment is no longer sufficient to repay the balance by the Maturity Date, your Minimum Payment will be increased by the amount necessary to repay the balance by the Maturity Date. You agree to pay not less than the Minimum Payment on or before the Payment Due Date indicated on your periodic billing statement.

**d) Payments**

All payments must be made by a check, money order, or other instrument in U.S. dollars and must be received by us at the remittance address shown on your periodic billing statement. Payments received at that address on any business day will be credited to your Credit Line as of the date received. Payments may also be made at any of our branch offices. You may also make payments by authorizing us to debit your Citizens Bank checking account each month in the amount of the Minimum Payment. Payments sent by mail must be mailed early enough to insure receipt by us on the Payment Due Date.

**4. Application of Payments.** Unless otherwise agreed or required by applicable law, during the Draw Period, payments and other credits will be applied in the following order: to the oldest unpaid billings first, and then sequentially to any other unpaid billings from the oldest to the most current. Payments in excess of billed amounts will be credited to your account. During the Repayment Period, your payments will be applied in the following order, assuming that it is made by the Payment Due Date: (a) The interest portion of the unpaid Minimum Payment; and (b) any additional amount paid that exceeds interest due will next be applied to the principal portion of the unpaid Minimum Payment. If you make a payment greater than the Minimum Payment, but less than the Total Due shown on your periodic statement you will still be required to make the Minimum Payments in the months that follow. We will refund to you any credit balance upon request if there is a credit balance on the date we receive the refund request.

**5. Credit Limit.** This Agreement covers a revolving line of credit for $ <u>60,000.00</u>     which will be your "Credit Limit" under this Agreement. This is the maximum credit that is to be extended to you. If the Credit Limit is exceeded, you will be in default of a material obligation under this Agreement and the provisions of **paragraph 7**, "Limitations on Use of Checks" will apply. You may borrow against the Credit Line, repay any portion of the amount borrowed, and re-borrow up to the amount of the Credit Limit. You agree not to attempt, request, or obtain a credit advance that will make your Credit Line Account balance exceed your Credit Limit. Your Credit Limit will not be increased should you overdraw your Credit Line Account. If you exceed your Credit Limit, you agree to repay immediately the amount by which your Credit Line Account exceeds your Credit Limit, even if we have not yet billed you.

Case: 12-10713-JMD Doc #: 219 Filed: 04/12/17 Desc: Main Document Page 25 of 37
Case: 12-10713-JMD Doc #: 50-2 Filed: 06/06/12 Desc: Exhibit Page 19 of 20

Page 3

**6. How to Use the Credit Line.** You may obtain credit advances under your Credit Line by writing a preprinted "check" that we will supply to you. Credit Line checks are specially designated checks which can be completed just like any other check. Each check written and negotiated will create a check advance from us to you. Checks drawn on the Account on forms other than those forms supplied by us for that purpose will not be honored. Each check you write will be paid with a check advance from your Account unless you are in default under this Agreement, as described in **paragraph 23**, "Termination and Acceleration", or in those circumstances described in **paragraph 7**, "Limitations on Use of Checks." Your use of a check will be reflected on your periodic statement as a check advance. Credit Line checks will not be certified by us and you agree that we may retain the actual checks written by you, and need not return the original checks to you. We may also provide additional ways of using your Account from time to time.

If there is more than one person authorized to use this Credit Line Account, each of you agree not to give us conflicting instructions, such as one of you telling us not to give check advances to the other. Any such instructions will not be followed by us. However, any one of you may cancel your Credit Line under **paragraph 30**, "Cancellation by You".

**7. Limitations on Use of Checks.** We reserve the right not to honor Credit Line checks in the following circumstances:

    (a) Your Credit Limit has been, or would be, exceeded by paying the check.
    (b) Your check is post-dated. If a post-dated check is paid and as a result any other check is returned or not paid, we are not responsible, subject to any applicable law.
    (c) Your checks have been reported lost or stolen.
    (d) Your check is not signed by an "Authorized Signer" as defined below.
    (e) Your Credit Line has been terminated or suspended as provided in this Agreement or could be if we paid the check.
    (f) You are in violation of any other transaction requirement or would be if we paid the check.

If we pay any check under these circumstances, you must repay us, subject to applicable laws, for the amount of the check. The check itself will be evidence of your debt to us together with this Agreement. Our liability, if any, for wrongful dishonor of a check is limited to your actual damages. Dishonor for any reason as provided in this Agreement is not wrongful dishonor.

**8. Authorized Signers.** The words "Authorized Signer" on checks as used in this Agreement mean and include each person who (a) signs the application for this Credit Line, and (b) signs this Agreement.

**9. Stop Payments.** We do not honor stop payment orders for checks drawn against your Credit Line Account. You therefore should not use your Credit Line Account if you anticipate the need to stop payment. You agree that we will have no liability to you or to any other party because we do not honor stop payment orders.

**10. Lost Checks.** If you lose your checks or someone is using them without your permission, you agree to notify us immediately. The fastest way to notify us is by calling us at (800) 922-9999. You also can notify us at Citizens Bank, Consumer Loan Servicing, 1 Citizens Drive, Riverside, RI 02915.

**11. Charges to Your Credit Line.** We may charge your Credit Line to pay other fees and costs that you are obligated to pay under this Agreement, under the Mortgage or under any other document related to your Credit Line. In addition, we may charge your Credit Line for funds required for continuing insurance coverage as described in the **paragraph 13**, "Insurance" or as described in the Mortgage. We may also, at our option, charge your Credit Line to pay any costs or expenses to protect or perfect our security interest in your dwelling. These costs or expenses include, without limitation, payments to cure defaults under any existing liens on your dwelling. If you do not pay your property taxes, we may charge your Credit Line and pay the delinquent taxes. Any amount so charged to your Credit Line will be a credit advance and will decrease the funds available, if any, under the Credit Line. However, we have no obligation to provide any of the credit advances referred to in this paragraph.

**12. Collateral.** This Agreement is secured by a Mortgage dated **04/07/2003** to us on property located in **ROCKINGHAM** County, State or Commonwealth of **NH**, (the "Property"). We have the right, but are not required to take such action as is necessary to protect our Security Interest described in this paragraph. Any amounts we may pay in exercising our right to protect our Security Interest must be paid by you on demand, and will bear interest at the Annual Percentage Rate then applicable to your account.

Case: 12-10713-JMD   Doc #: 219   Filed: 04/12/17   Desc: Main Document   Page 26 of 37
Case: 12-10713-JMD   Doc #: 56-2   Filed: 06/06/12   Desc: Exhibit   Page 19 of 20

Page 4

**13. Insurance.** You must obtain insurance on the Property securing this Agreement through any company of your choice that is reasonably satisfactory to us for the lesser of the replacement cost of the buildings or appurtenances on the Property or the amount of the Credit Line plus any priority liens. You must name Citizens Bank as mortgagee on all required insurance policies. The insurance you maintain must provide for Ten (10) days notice of cancellation to us. If the Property is located in a designated Flood Zone, you must also maintain flood insurance on the Property. Subject to applicable law, if you fail to obtain or maintain insurance as required herein or in the Mortgage, we may purchase insurance to protect our own interest, add the premium to your balance, pursue any other remedies available to us, or do any one or more of these things.

In the event the Borrower fails to obtain and maintain any insurance on the Property required by the Lender, the Borrower understands and agrees that the Lender may, at its option (unless required to do so by applicable law), obtain and maintain the required insurance and pay the premium(s) for such insurance, and either: (i) add the cost of the insurance to the unpaid principal balance owed under the Agreement (in which case the Borrower agrees to repay the cost of the insurance in accordance with the repayment terms of the Agreement), or (ii) bill the Borrower separately (in which case the Borrower agrees to pay the bill immediately). The Borrower agrees to pay interest on any such amounts at the interest rate provided in the Agreement until such amounts are repaid in full. The Borrower understands and acknowledges that any insurance obtained and maintained by the Lender may (i) only protect the interests of the Lender and any other creditor with a prior mortgage on the Property, and (ii) be more expensive than insurance obtained and maintained by the Borrower.

**14. Right of Setoff.** We have the right under the law to transfer funds held in any deposit account that any person who signs this Agreement has with us or an affiliated bank, to pay or reduce your obligations if you are in default under this Agreement or we terminate or accelerate your Credit Line Account. You grant to us a contractual possessory security interest in, and hereby assign, convey, deliver, pledge, and transfer to us all right, title and interest in and to, your accounts with us (whether checking, savings, or some other account), including without limitation all accounts held jointly with someone else and all accounts you may open in the future, excluding however all IRA, Keogh, and trust accounts. You authorize us, to the extent permitted by applicable law, to charge or set off all sums owing under this Agreement against any and all such accounts.

**15. Periodic Statements.** We will send you a periodic statement for all check advances made under this Agreement during the Draw Period and for all monthly payments due during the Repayment Period. The statement will show, among other things, payments and credits, check advances, FINANCE CHARGES, insurance, and other charges, your Previous Total Balance, and your New Total Balance. Your statement also will identify the Minimum Payment you must make for that billing period and the Payment Due Date. All periodic statements shall conclusively be considered to be correct and accepted by you unless we are notified in writing of any alleged errors within 60 days after receipt.

**16. FINANCE CHARGES.** You will pay a FINANCE CHARGE on the outstanding amount of the principal balance under your Credit Line, once each billing cycle during the Draw Period and the Repayment Period. The FINANCE CHARGE will begin to accrue on the date advances are posted to your Credit Line Account. There is no "grace period" which would allow you to avoid a FINANCE CHARGE on your Credit Line advances. FINANCE CHARGES do not accrue on any undisbursed proceeds.

**17. Method Used to Determine the Balance on Which the FINANCE CHARGE Will Be Computed.** We figure the FINANCE CHARGE on your account by applying the daily periodic rate to the average daily balance of your Credit Line Account and then multiply by the number of days in the billing cycle. To get the average daily balance, we take the total beginning balance of your Credit Line Account each day and add new advances and subtract the principal portion of any payments and credits. The beginning balance for the period is the New Principal Balance amount from your previous statement. To determine the principal portion of a payment, subtract any unpaid FINANCE CHARGES then insurance premiums (if any) and membership fees and other charges (if applicable). This gives us the daily principal balance each day. Then we add up all the daily principal balances for the billing cycle and divide the total by the number of days in the billing cycle (the number of days since your last statement). This gives us the average daily balance. The average daily balance does not include finance charges, insurance premiums, membership fees or other charges.

**18. How You May Compute the Finance Charges On Your Line of Credit Account.** When the average daily balance has been computed, you multiply the average daily balance by the daily periodic rate which is arrived at by dividing the Annual Percentage Rate by the number of days in the year. The result is multiplied by the number of days in the billing cycle. This figure is the FINANCE CHARGE assessed for the billing cycle.

Case: 12-10713-JMD Doc #: 219 Filed: 04/12/17 Desc: Main Document Page 27 of 37
Case: 12-10713-JMD Doc #: 58-2 Filed: 08/08/12 Desc: Exhibit E Page 29 of 30

Page 5

**19. Periodic Rate and Corresponding ANNUAL PERCENTAGE RATE.** We will determine the Periodic Rate and the corresponding **ANNUAL PERCENTAGE RATE** as follows. We start with an independent index, (the "Index"), which is The Wall Street Journal Prime Rate, published daily in the listing of "Money Rates." We will use the Index value published on the last business day of each month for any **ANNUAL PERCENTAGE RATE** adjustment. If the Index is no longer available, we will choose a new Index and margin. The new Index will have an historical movement similar to the original Index and margin, and the new Index and margin will result in an Annual Percentage Rate that is substantially similar to the rate in effect at the time the original Index becomes unavailable. The Index is not necessarily the lowest rate charged by us on our loans. To determine the Periodic Rate that will apply to your Credit Line Account, we add a margin to the value of the Index, then divide the value by the number of days in a year (daily). To obtain the **ANNUAL PERCENTAGE RATE,** we multiply the Periodic Rate by the number of days in a year (daily). This result is the **ANNUAL PERCENTAGE RATE.** The **ANNUAL PERCENTAGE RATE** includes only interest and no other costs.

The Periodic Rate and the corresponding **ANNUAL PERCENTAGE RATE** on your Credit Line will increase or decrease as the Index increases or decreases from time to time. Any increase in the Periodic Rate will take the form of higher payment amounts. Adjustments to the Periodic Rate and the corresponding **ANNUAL PERCENTAGE RATE** resulting from changes in the Index will take effect on the first day of the next billing cycle. In no event will the **ANNUAL PERCENTAGE RATE** be more than the lesser of 18.000% or the maximum rate allowed by applicable law. As of the date this Agreement was printed, the Index is __4.25__ % per annum. Based on that Index value, we estimate that the initial Periodic Rate and the corresponding **ANNUAL PERCENTAGE RATE** on your Credit Line for the first billing cycle will be as stated below: The initial Periodic Rate and corresponding **ANNUAL PERCENTAGE RATE** actually in effect during the first billing cycle, which will be disclosed on your first periodic statement, may differ from these estimates if the Index changes between the date this Agreement was printed and the date you sign this Agreement.

| Margin Added to Index | ANNUAL PERCENTAGE RATE | Daily Periodic Rate |
|---|---|---|
| - 0.510 % | 3.74000% | 0.01025% |

**20. Conversion Option.** You can exercise the option to convert to a fixed rate only at the end of the Draw Period. Your **ANNUAL PERCENTAGE RATE** may increase if you exercise this option to convert to a fixed rate.

The fixed rate will be determined as follows. The **ANNUAL PERCENTAGE RATE** will be fixed during the entire Repayment Period and will be equal to 2 ½% added to the Index which is in effect on the date that the final Draw Period payment is due, but will not be more than 18.00%. In the event the Prime Rate is published as a range of rates, then the lowest rate published shall be the Index. If The Wall Street Journal ceases publication of the Prime Rate we may select a substantially similar Index which we will use to determine the **ANNUAL PERCENTAGE RATE** for the Repayment Period.

In no event shall the Finance Charge exceed that allowable under any applicable law. If it is determined that the Finance Charge would, except for this provision, exceed the maximum rate allowable, all excess payments shall be considered to be payments on the principal balance due hereunder and shall be applied accordingly.

**21. Annual Fee.** There is no Annual Fee for the first year. Thereafter, a non-refundable Annual Fee of $50 will be charged to your Credit Line Account on each anniversary of your Credit Line, during the Draw Period. We will lower your Annual Fee by $25.00 if you maintain a Citizens Circle Gold Checking Account or any other deposit relationship account that we may deem from time to time to warrant a discount. If you close your Citizens Circle Gold Checking Account or other designated deposit relationship account, a non-refundable Annual Fee of $50.00 will be charged to your Credit Line Account on each Anniversary of your Credit Line Account, during the Draw Period thereafter.

Case: 12-10713-JMD   Doc #: 219   Filed: 04/12/17   Desc: Main Document   Page 28 of 37
Case: 12-10713-JMD   Doc #: 56-2   Filed: 08/06/12   Desc: Exhibit   Page 29 of 30

Page 6

**22. Late Charges.** Depending on the state in which you signed this Agreement, your late fee will be calculated as follows:

> **MA:** Your payment will be late if it is not received by us within **15 days of the "Payment Due Date" shown on your periodic statement.** If your payment is late, we may charge you 3.000% of the payment or $10.00, whichever is less. You will pay this late charge only once on any late payment.

> **CT and RI:** Your payment will be late if it is not received by us within **10 days of the "Payment Due Date" shown on your periodic statement.** If your payment is late, we may charge you 5.000% of the payment or $10.00, whichever is less.

> **NH:** Your payment will be late if it is not received by us within **10 days of the "Payment Due Date" shown on your periodic statement.** If your payment is late, we may charge you 7.000% of the payment or $12.50, whichever is greater.

> **PA and DE:** Your payment will be late if it is not received by us within **15 days of the "Payment Due Date" shown on your periodic statement.** If your payment is late, we may charge you 10.000% of the payment or $20.00, whichever is greater.

**23. Termination and Acceleration.** The entire unpaid balance of your Credit Line Account, including unpaid fees and Finance Charges, shall at our option become immediately due and payable and we can terminate your Credit Line Account by sending you notice, if any of the following occur:

> (a) You have at any time in connection with this Credit Line Account, including your application for same, committed fraud or have made, or make at anytime, any material misrepresentation. For purposes of this provision, fraud and material misrepresentation shall mean knowingly making any false financial or other statement with the intent that it be relied upon by us and/or intentionally failing to disclose information in connection with the Credit Line Account;

> (b) Failure to make any payment under this Agreement;

> (c) Your action or inaction adversely affects the collateral for the Credit Line Account or our rights in the collateral. This can include, for example, failure to maintain required insurance, waste or destructive use of the Property, failure to pay taxes, failure to maintain adequate insurance for the Security, death of all persons liable on the Credit Line Account or the death of any of the Borrowers if the collateral is adversely affected by such death, transfer of title or sale of the Property, the Property is taken through eminent domain, creation of a senior lien on the Property without our permission, foreclosure by the holder of a prior lien or the use of the dwelling for prohibited purposes.

**24. Suspension or Reduction.** In addition to any other rights we may have, (neither notice nor your agreement is required), we can suspend additional extensions of credit or reduce your Credit Limit during any period in which any of the following are in effect:

> (a) The value of the Property declines significantly below the Property's appraised value for purposes of this Credit Line Account. This includes, for example, a decline such that the initial difference between the credit limit and the available equity is reduced by fifty percent and may include a smaller decline depending on the individual circumstances;

> (b) We reasonably believe that you will be unable to fulfill your payment obligations under your Credit Line Account due to a material change in your financial circumstances;

> (c) You are in default under any material obligations of this Credit Line Account. We consider all of your obligations to be material. Categories of material obligations include the events described above under **paragraph 23,** "Termination and Acceleration", obligations to pay fees and charges, obligations and limitations on the receipt of credit advances, obligations concerning maintenance or use of the Property, obligations to pay and perform the terms of any other deed of trust, mortgage or lease of the Property, obligations to notify us and to provide documents or information to us (such as updated financial information), obligations to comply with applicable laws (such as zoning restrictions), and obligations of any comaker. No default will occur until we mail or deliver a notice of default to you, so you can restore your right to credit advances;

(d) Government action prevents us from imposing the ANNUAL PERCENTAGE RATE provided for under this Agreement, or impairs our security interest such that the value of the Property is less than 120 percent of the credit line;

(e) We have been notified by governmental authority that continued advances may constitute an unsafe and unsound business practice. We may charge your account for appraisal and Credit Report fees we incur in investigating whether any condition permitting us to suspend your credit privileges or reduce your credit limit continues to exist;

(f) The maximum Annual Percentage Rate is reached.

If your Credit Line is suspended or terminated, you must immediately destroy all Credit Line checks and any other access devices. Any use of checks or other access devices following suspension or termination may be considered fraudulent. You will also remain liable for any further use of such checks or other Credit Line access devices not returned to us.

**25. Change in Terms.** We may make changes to the terms of this Agreement if you agree to the change in writing at that time, if the change will unequivocally benefit you throughout the remainder of your Credit Line Account, or if the change is insignificant (such as changes relating to our data processing systems).

**26. Collection Costs.** If you fail to abide by any terms of this Agreement, and if we are permitted to do so by applicable law, we may hire or pay someone else to help collect your Credit Line Account. You will pay all reasonable collections costs, including reasonable attorney's fees incurred by us in the collection of amounts due under this Agreement. This includes, subject to any limits under applicable law, our legal expenses whether or not there is a lawsuit and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay of injunction), appeals, and any anticipated post-judgment collection services. In **New Hampshire,** if, but only if, by applicable law, we are permitted to collect attorney's fees from you as part of our costs of collecting any amounts due under this Agreement, then you, to the extent required by New Hampshire Revised Statutes Annotated Chapter 361-C, as amended, shall be entitled to reasonable attorney's fees if you prevail in (a) any action, suit or proceeding brought by us, or (b) any action brought by you. If you successfully assert a partial defense or setoff, recoupment or counterclaim to any action brought by us, the court may withhold from us the entire amount or such portion of the attorney's fees as the court considers equitable.

**27. Delay in Enforcement.** Failure at any time by us to exercise any of our rights hereunder shall not constitute a waiver of our right to exercise the same at a later time.

**28. Default.** You will be in default under this Agreement if any of the following occurs, each of which constitutes a breach of a material obligation of yours under this Agreement:

    (a) You fail to make any payment when due or to pay any charge or fee when due;

    (b) Your action or failure to act adversely affects our security for your Credit Line Account or a right we have in the security (an attempt by any other creditor to take money or other property of yours that is in our possession is an example of a failure to act that would adversely affect our security or security interest);

    (c) A court determines that you are bankrupt or insolvent; or

    (d) You gave or give us false or materially misleading information in connection with any extension of credit to you under your Credit Line Account.

**29. Results of Default.** If you are in default, we may lower your Credit Limit, we may refuse to make any further advances under this Agreement, we may refuse to pay any outstanding checks that would require us to make an additional credit advance to you, we may foreclose on the real property described in the Mortgage securing your Credit Line Account, we may take whatever other action is permitted under the Mortgage, and we may exercise any and all of our rights with respect to any other property securing your Credit Line Account. We also may demand that you pay the full amount you owe on your Credit Line Account immediately.

You agree to pay any costs we incur in collecting what you owe following your default. If we have to sue you to collect what you owe, you agree to pay our legal fees, including court costs. In addition to our other rights and remedies under this agreement and the Mortgage, we reserve the right to honor the check or other device used to obtain an advance without permanently raising your credit limit. If we honor the check or other device, the amount that is more than your credit limit will be due and payable immediately.

Case: 12-10713-JMD Doc #: 219 Filed: 04/12/17 Desc: Main Document Page 30 of 37
Case: 12-10713-JMD Doc #: 58-2 Filed: 08/06/12 Desc: Exhibit Page 29 of 29

Page 8

**30. Cancellation by You.** If you cancel your right to credit advances under this Agreement, you must notify us in writing and destroy all Credit Line checks and any other Credit Line Account access devices. Despite cancellation, your obligations under this Agreement will remain in full force and effect until you have paid us all amounts due under this Agreement.

**31. Prepayment.** You may make additional payments or may pay back more than the Minimum Payment Due at any time without penalty, except we will be entitled to receive all accrued **FINANCE CHARGES,** and other charges, if any. Payments in excess of your Minimum Payment will not relieve you of your obligation to continue to make your Minimum Payments. Instead, they will reduce the principal balance owed on the Credit Line. If you mark a check, money order, or other instrument sent in payment with "Paid in Full" or with similar language, we may accept the payment, and you will remain obligated to pay any further amount owed to us under this Agreement.

**32. Notices.** All notices will be sent to your address as shown in this Agreement unless you notify us in writing of any change in your address or name within thirty (30) days of the change. On joint accounts, notices sent to one will be considered notice sent to all.

*33. Information About You.* You authorize us to get financial information about you from third parties, including, but not limited to, a credit bureau, your employer, or another financial institution. You also authorize us to disclose information about your creditworthiness and this Account to a credit bureau, our affiliates and subsidiaries, and to others, unless expressly prohibited by applicable law. We may require a new appraisal of the Property which secures your Credit Line at any time, including an internal inspection, at our sole option and expense, except as provided for in **paragraph 24,** "Suspension or Reduction".

**34. Documentation.** You agree to execute or re-execute any document that we request in order to correct any error or omission in the original Agreement, security instrument, or other Credit Line Account related documents, including, but not limited to, Confirmatory or Corrective security instruments.

**35. Transfer or Assignment.** Without prior notice or approval from you, we reserve the right to sell or transfer your Credit Line Account to another lender, entity, or person, and to assign our rights under the Mortgage. Your rights under this Agreement belong to you only and may not be transferred or assigned. Your obligations, however, are binding on your heirs and legal representatives.

**36. Tax Deductibility.** You understand that Lender makes no representation or warranty whatsoever concerning the tax consequences of this Credit Line Account, including the deductibility of interest, and that you should consult with your own tax advisor for guidance on this subject. You also agree that Lender shall not be liable in any manner whatsoever should the interest paid on the Credit Line Account not be deductible.

**37. Governing Law.** This Agreement is governed by federal law and by the laws of the state or commonwealth in which the bank is located: The Commonwealth of Massachusetts, the State of Rhode Island, the State of Connecticut, the State of New Hampshire, the Commonwealth of Pennsylvania or the State of Delaware. To the extent that federal law preempts state law, this Agreement is governed by federal law. If any provision of this Agreement conflicts with any existing or future law, it shall be deemed modified to the extent necessary to comply with such law and the validity of the remaining terms shall not be affected.

Case: 12-10713-JMD Doc #: 50-2 Filed: 06/06/12 Desc: Exhibit Page 29 of 30

**38. Interpretation.** The names given to paragraphs or sections in this Agreement are for reference purposes only. They are not to be used to interpret or define the provision of this Agreement. You agree that this Agreement, together with the Mortgage, is the best evidence of your agreement with us. If a court finds that any provision of this Agreement is not valid or should not be enforced, that fact by itself will not mean that the rest of this Agreement will not be valid or enforced. Therefore, a court may enforce the rest of the provisions of this Agreement even if a provision of this Agreement may be found to be invalid or unenforceable. If we go to court for any reason, we can use a copy, filmed or electronic, of any periodic statement, this Agreement, the Mortgage, or any other document to prove what you owe us or that a transaction has taken place. The copy, microfilm, microfiche, or optical image will have the same validity as the original. You agree that, except to the extent you can show there is a billing error, your most current periodic statement is the best evidence of your obligation to pay.

**39. Acknowledgment.** You understand and agree to the terms and conditions in this Agreement. By signing this Agreement, you acknowledge that you have read this Agreement. You also acknowledge receipt of a copy of this Agreement, including the Fair Credit Billing Notice and the early Home Equity Line of Credit application disclosure, in addition to the handbook entitled "When Your Home Is On the Line: What You Should Know About Home Equity Lines of Credit," and disclosures/notices provided under applicable state law; given with the application before signing the Mortgage and before using your Credit Line Account.

If there is more than one Borrower, each is jointly and severally liable on this Agreement. This means we can require any one of you to pay all amounts due under this Agreement, including credit advances made to any of you. Each Borrower authorizes any other Borrower, on his or her signature alone, to cancel the Credit Line, to request and receive credit advances, and to do all other things necessary to carry out the terms of this Agreement. We can release any of you from responsibility under this Agreement, and the other Borrowers will remain responsible.

---

You, the undersigned, certify that you have insured the property as identified in **Section 12**, entitled "Collateral", against loss by fire in an amount sufficient to cover this lien and all superior liens, and that the policy includes extended coverage and has a standard mortgagee clause making loss payable to Citizens as its interest may appear.

You agree it is your responsibility to keep the premises, as identified in **Section 12**, entitled "Collateral", insured in an amount at least equal to the replacement cost of any buildings on the property, until this Agreement is paid in full.

You understand that you may purchase any required insurance through any duly licensed insurance agent and insurance company that is reasonably acceptable to us. You are not required to deal with any of our affiliates when choosing an insurance agent or insurance company. Your choice of a particular insurance agent or insurance company will not affect our credit decision, so long as the insurance provides adequate coverage with an insurer that meets our reasonable requirements.

All documents related to insurance for this loan should be mailed to the following address:
Citizens Bank, Consumer Finance Operations
1 Citizens Drive
Riverside, RI 02915
(800)708-6680

Page 10

### Authorization of Payments to Third Parties

$  60,000.00   Credit Limit

Amount paid to others on my behalf:

|  |  |  |
|---|---|---|
| $ | 127,321.00 | Paid to AMEX |
| $ | 12,679.00 | Paid to F AND S MCMENIMEN |
| $ | 335.92 | Paid to |
| $ |  | Paid to |
| $ |  | Paid to |
| $ |  | Paid to |
| $ |  | Paid to |
| $ |  | Paid to |
| $ |  | Paid to |
| $ |  | Paid to |
| $ |  | Paid to |
| $ |  | Paid to |
| $ |  | Paid to |
| + $ | 0.00 | Amount received from borrower |
| - $ | 0.00 | Total fees to be paid by borrower |
| + $ | 35,000.00 | Undisbursed Funds |

You understand that no loan proceeds will be disbursed until any notice of the right to cancel time period specified has expired. You authorize disbursements listed above and acknowledge receipt of a filled in copy of this itemization of amount financed.

You acknowledge that any payoff amounts referenced in the of Authorization of Payments to Third Parties section of this Agreement were estimates based on the balances listed on your credit bureau report(s). By signing below, you authorize all handwritten changes, made to the payoff figures in this Agreement, and confirm that these changes accurately reflect the payoff figures you provided at closing.

You acknowledge that you received and read, as applicable, the Home Equity disclosure statements provided to you during the application process, which include *Important Terms, When Your Home is On the Line, Servicing Disclosure Statement, Good Faith Estimate, Right to Receive a Copy of an Appraisal, Citizens' Pledge Regarding the Responsible Use and Protection of Customer Information,* for MA residents only, *Massachusetts Mortgage Loan Disclosure, Uniform Mortgage Loan Cost Worksheet, Consumer Guide to Obtaining a Mortgage,* for CT residents only, *Mortgagor's Right to Counsel,* for RI residents only, *Choice of Title Attorney Disclosure,* and for NJ residents only, *Right to Own Counsel Disclosure.* You also acknowledge, unless you applied for credit through Citizens Bank of Massachusetts (where credit insurance is not available), that you received the Insurance Application Disclosure, both orally (if you applied in a branch office or by telephone) and in writing, at the time you applied for credit.

You acknowledge that with your application, you provided your consent to us to check your employment and credit history with any source and to answer questions about your credit experience with us.

NOTICE TO NEW JERSEY BORROWERS: READ THIS NOTE BEFORE YOU SIGN. DO NOT SIGN THIS NOTE IF IT CONTAINS BLANK SPACES. THE NOTE IS SECURED BY A SECONDARY MORTGAGE ON YOUR REAL PROPERTY.

This Agreement is dated _04/07/2003_. THIS AGREEMENT IS SIGNED UNDER SEAL.

BORROWER:

X _____
FREDERICK V MCMENIMEN III

X _____
SHAUNA S MCMENIMEN

X _____

X _____

Effective Disbursement Date: _04/11/2003_

## BILLING ERROR RIGHTS

### YOUR BILLING RIGHTS

### KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

**Notify us in case of errors or questions about your bill.**

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet at the address checked at the beginning of this Agreement or at the address listed on the back of your bill. Write to us as soon as possible. We must hear from you no later than sixty (60) days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:

 Your name and account number.

 The dollar amount of the suspected error.

 Describe the error and explain, if you can, why you believe there is an error.  If you need more information, describe the item you are not sure about.

If you have authorized us to pay your bill automatically from your savings or checking account, you can stop the payment on any amount you think is wrong. To stop the payment, your letter must reach us three (3) business days before the automatic payment is scheduled to occur.

**Your rights and our responsibilities after we receive your written notice.**

We must acknowledge your letter within thirty (30) days, unless we have corrected the error by then. Within ninety (90) days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your Credit Limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date on which it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten (10) days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW HAMPSHIRE

In re:

MCMENIMEN, Frederick V., III                  ,          Bk. No. __12-__ 10713 __-JMD__

                           Debtor          Chapter _7_

### STATEMENT — MOTION FOR RELIEF WORKSHEET NOT REQUIRED

The movant states that *LBF 4001-1A*, Worksheet Completed by the Mortgagee/Servicer in Support of Motion for Relief from Stay Involving Residential Real Property, is not required to be filed with this motion because:

☐    The movant has obtained the Debtor's assent to the motion prior to the motion being filed with the Court.

☑    The Debtor has indicated an intent to surrender the real property that is the subject of the motion in the Debtor's statement of intention filed with the Court pursuant to 11 U.S.C. § 521(a)(2).

☐    The Debtor has indicated an intent to surrender the real property that is the subject of the motion in the Debtor's plan of reorganization.

Date: **8/6/12**                                      /s/David C. Green

                                         Signature
                                         **David C. Green, David C. Green, PC**
                                         Print Name
                                         Address **127 Main St., Ste. 7**
                                         **Nashua, NH 03061**
                                         Tel. No. **603-882-4963**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

In Re:  MCMENIMEN, Frederick V., III     )   Chapter 7
                                  )   Case No. :12-10713 JMD
     Debtor                     )
                                  )

## AFFIDAVIT OF DEBTOR'S MILITARY STATUS

      I, David C. Green, Esquire hereby state that, based on the information provided by the Department of Defense Manpower Data Center website, the debtor is not in the military service as defined in the Servicemembers Civil Relief Act of 2003 (SCRA).

      Sworn under the pains and penalties of perjury this 6th day of August, 2012.

                     Respectfully submitted,

                     RBS Citizens, N.A.
                     By Its Attorney,
                     David C. Green, P.C.

Dated:  8/6/12                  /s/David C. Green
                          DAVID C. GREEN
                          127 Main Street, Ste. 7
                          PO Box 1068
                          Nashua, NH  03061-1068
                          (603) 882-4963
                          BNH No.: 04020

## CERTIFICATION OF SERVICE

      I, David C. Green, attorney for RBS Citizens, N.A., hereby certify that on this date I served the foregoing causing such to be sent electronically via email to Michael B. Feinman, Esquire and Mark P. Cornell, Trustee.

Dated: 8/6/12                                     /s/David C. Green
                                      DAVID C. GREEN

# United States Bankruptcy Court
## District of New Hampshire

MCMENIMEN, Frederick V., III    *      Chapter 7
                                   *      Case No. 12-10713 JMD
Debtors                            *

## NOTICE OF HEARING

Please take notice that a hearing will be held:

DATE:          August 28, 2012

TIME:           9:00 a.m.

LOCATION: Bankruptcy Courtroom_____2_____, 1000 Elm Street, 11th Floor, Manchester, New Hampshire

To consider and act upon the following:

Motion for Relief from Stay filed by _____RBS, Citizens, National Association

Last day for Objections:    August 21, 2012

**IF NO OBJECTIONS ARE FILED** by the answer date and the movant has complied with Administrative Order 1074-1, an Order granting the relief sought will be entered without a hearing.

DATED: _____8/6/12_____     By: ___/s/David C. Green_____

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

In Re:     MCMENIMEN, Frederick V., III,    )
                                      ) Chapter 7
                                      ) Case No.: 12-10713 JMD
               Debtors                    )
_____ )

## ORDER GRANTING RELIEF FROM AUTOMATIC STAY

The Motion of RBS Citizens, National Association requesting relief from the automatic stay provided for by Section 362(a) of the Bankruptcy Code is hereby granted.

It is further ordered and adjudged as follows:

RBS Citizens, N.A. has permission to repossess and foreclose its interest and lien as permitted under the terms, conditions and covenants of the loan documents and the laws of the State of New Hampshire on property located at 6 Pumpkin Circle, Exeter, Rockingham County, New Hampshire.

Dated:                          BY THE COURT:

_____
Bankruptcy Judge